No. 35        September 18, 2025        189

IN THE SUPREME COURT OF THE
STATE OF OREGON

PACIFICORP,
*Plaintiff-Appellant,*
*Cross-Respondent,*

*v.*

DEPARTMENT OF REVENUE,
State of Oregon,
*Defendant-Respondent,*
*Cross-Appellant.*
(TC 5411) (SC S070564)

En Banc

On appeal from the Tax Court.*

Robert T. Manicke, Judge.

Argued and submitted September 26, 2024.

David J. Crapo, Crapo Deeds PLLC, Bountiful, Utah, argued the cause and filed the briefs for plaintiff-appellant/cross-respondent. Also on the briefs was Dustin T. Till, PacifiCorp, Portland.

Christopher A. Perdue, Assistant Attorney General, Salem, argued the cause and filed the briefs for defendant-respondent/cross-appellant. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

GARRETT, J.

The judgment of the Tax Court is reversed, and the case is remanded to the Tax Court for further proceedings.

_____
* 25 OTR 227 (2023); and 25 OTR 367, *modified and adh'd to as modified on recons*, 25 OTR 419 (2023).

**GARRETT, J.**

This case involves an appeal and cross-appeal from a final judgment of the Tax Court. Taxpayer PacifiCorp has appealed the aspect of the Tax Court's decision memorialized in *PacifiCorp v. Dept. of Rev.*, 25 OTR 367, *modified and adh'd to as modified on recons*, 25 OTR 419 (2023). In those opinions, the Tax Court rejected PacifiCorp's contention that the state unconstitutionally taxed PacifiCorp's intangible property. We described the Tax Court's ruling in more detail, and addressed the merits of PacifiCorp's contentions, in *Delta Air Lines, Inc. v. Dept. of Rev.*, 374 Or 58, ___ P3d ___ (decided July 24, 2025). For the reasons explained in that opinion, *see* 374 Or at 61 (summarizing this court's conclusion), we affirm as to PacifiCorp's appeal without further discussion.

This opinion otherwise concerns the Department of Revenue's cross-appeal from the Tax Court's determination of PacifiCorp's real market value for tax year 2020-21. *PacifiCorp v. Dept. of Rev.*, 25 OTR 227 (2023). In that opinion, the Tax Court concluded that it was not bound by an administrative rule promulgated by the Department of Revenue that prescribes methods and practices for calculating real market value. The department asserts that the rule is valid and binding and that the Tax Court erred in concluding otherwise.

For the reasons that follow, we agree with the department. The Tax Court's conclusion that it was not required to "defer" to the rule was legally erroneous. Absent a determination that the rule is invalid facially or as applied, the department's rule is law, and it must be given legal effect. Because it appears that the Tax Court's legal error may have affected how it evaluated the evidence, we reverse the Tax Court's decision and remand for the court to reconsider the case, applying the correct legal standard.

## I.   BACKGROUND

The issue in this case turns on the validity of a particular administrative rule setting out methods to be used to determine real market value in certain tax cases. We begin

by providing an overview of the principles of administrative law that govern the validity of rules.

## A.   *Determining Validity of Administrative Rules*

This court has previously explained that a court properly analyzes the validity of an agency action by a sequence of steps:

> "In the proper sequence of analyzing the legality of action taken by officials under delegated authority, the first question is whether the action fell within the reach of their authority, the question which in the case of courts is described as 'jurisdiction.' If that is not in issue, \*\*\* the question is whether the action was taken by procedures prescribed by statute or regulation. Assuming that proper procedures were followed, the next question is whether the substance of the action, though within the scope of the agency's or official's general authority, departed from a legal standard expressed or implied in the particular law being administered, or contravened some other applicable statute."

*Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984); *see Nay v. Dept. of Human Services*, 360 Or 668, 680-82, 385 P3d 1001 (2016) (applying that framework). "These steps are designed to assure that the challenged action \*\*\* in fact was authorized by the state's or local government's politically accountable policy makers." *Planned Parenthood*, 297 Or at 565.

Those steps also apply to determining the validity of an administrative rule, although the rule challenge may take one of two forms. We have described those as a "facial" challenge and an "as applied" challenge. *Nay*, 360 Or at 679 (noting "facial challenge" terminology); *Oregon Newspaper Publishers v. Dept. of Corrections*, 329 Or 115, 118-19, 988 P2d 359 (1999) (using "as applied" terminology). In a "facial" challenge to the validity of a rule, the court does not examine the facts of any particular case. Instead, the court considers only the rule and the statutes at issue (and, if appropriate, evidence regarding compliance with rulemaking procedures). ORS 183.400(3) (limiting what court may examine on judicial review of administrative rule); *see Wolf v. Oregon Lottery Commission*, 344 Or 345, 354, 182 P3d 180

(2008) ("judicial review under ORS 183.400 is limited to the face of the rule and the law pertinent to it" (internal quotation marks, emphasis, and citations omitted)).[1] In an "as applied" challenge, the court considers whether the agency's application of the rule to a particular factual situation may violate statutory or constitutional requirements. *See AFSCME Local 2623 v. Dept. of Corrections*, 315 Or 74, 84, 843 P2d 409 (1992) (in holding facially valid a rule that permitted the Department of Corrections to search employees entering prison, court noted that propriety of factual claim that the department was "allowing itself" to conduct body cavity searches would have to be challenged in the proper forum (internal quotation marks omitted)); *Criminal Justice Reform Clinic v. Board of Parole*, 313 Or App 592, 597, 496 P3d 688 (2021) (in holding facially valid rules regarding parole consideration for certain juveniles convicted of aggravated murder, court explained that a claim that the rules might sometimes affect juveniles in ways that illegally failed to consider their age could be addressed by "as applied" challenge).

Regardless of whether the challenge is facial or as applied, the courts will consider substantively whether the agency's rule is inconsistent with the commands of statutory or constitutional law.

But if an administrative rule is valid—that is, if it was adopted through lawful procedures and is neither invalid on its face nor invalid as applied—then it is law, and a court is bound by it. That is exemplified by this court's decision in *U. P. R. R. Co. v. Tax Commission*, 240 Or 628, 402 P2d 519 (1965). There, the State Tax Commission had enacted a rule that prohibited the taxpayers from deducting interest as an expense. *Id.* at 629. The Tax Court had "construed the regulatory powers of the [c]ommission narrowly," *id.* at 630, and it had ordered the commission to give refunds, *id.* at 629. This court reversed the Tax Court:

---

[1] We note that, under the circumstances presented here, ORS 183.400 could properly be invoked in the Tax Court. Although the first part of that statute gives the Court of Appeals jurisdiction over rule challenges, ORS 183.400(1), other courts may also consider the validity of a rule when the question before the court involves "enforcement of such rule *** in the manner provided by law," ORS 183.400(2).

> "We hold that the regulation was duly promulgated under specific legislative authority, and that it has the force of law. Since we cannot say as a matter of law that the Commission exceeded its authority, we hold that the regulation was valid as applied. Accordingly, it was error to allow the refunds."

*Id.* at 632 (citation omitted). Or, as this court stated more broadly in *Bronson v. Moonen*, 270 Or 469, 476, 528 P2d 82 (1974), "[a]dministrative rules and regulations are to be regarded as legislative enactments having the same effect as if enacted by the legislature as part of the original statute."

B.   *Central Assessment, Valuation, and "Real Market Value"*

This case involves the calculation of property tax for a business that is centrally assessed under Oregon law, meaning that it is assessed by the department rather than by local assessors. *See* ORS 308.515(1) (listing businesses subject to centrally assessment). Generally speaking, the central assessment process involves calculating the value of the taxpayer as a whole and then taxing the taxpayer on the fraction of that value attributable to Oregon. *See* ORS 308.555 (prescribing unit valuation generally); ORS 308.550 (addressing allocation methods for taxpayer operating both inside and outside Oregon); *Comcast Corp. v. Dept. of Rev.*, 356 Or 282, 290-93, 337 P3d 768 (2014) (describing process).

The goal of the valuation process is to determine "real market value" as that term is defined by both the Oregon Constitution and by statute.[2] Article XI, section 11(11)(a)(A), of the Oregon Constitution provides:

> "The real market value of property shall be the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year, as established by law."

---

[2] The central assessment statutes themselves often refer only to "value." *See* ORS 308.555 ("for the purpose of arriving at the assessed value of the property," department "may value the entire property, both within and without the State of Oregon, as a unit"). It seems clear from other provisions of the central assessment statutes, however—as well as context—that the legislature meant "real market value" as defined. *See* ORS 308.674 (authorizing exemption based in part on "real market value" of centrally assessed businesses).

The legislature essentially repeated that definition in ORS 308.205(1):

"Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

As the quoted text of the constitutional provision shows, it contemplates that the legislature may expand on that definition ("as established by law"). The legislature did so in ORS 308.205(2):

"Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

"(a)   The amount a typical seller would accept or the amount a typical buyer would offer that could reasonably be expected by a seller of property.

"(b)   An amount in cash shall be considered the equivalent of a financing method that is typical for a property.

"(c)   If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property.

"(d)   If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, real market value shall not be based upon sales that reflect for the property a value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions."

More than one method exists for calculating real market value. Appraisers generally recognize three such methods: comparable sales (the market approach), capitalization of income (the income approach), and cost (the cost approach). *Chapin v. Dept. of Rev.*, 290 Or 931, 936, 627 P2d 480 (1981); *Swenson v. Dept. of Rev.*, 276 Or 1, 4, 553 P2d 351 (1976); *see Dept. of Rev. v. River's Edge Investments, LLC*, 359 Or 822, 827, 377 P3d 540 (2016) (valuation of real property). "The cost approach estimates value from the cost that

would be needed to construct a similar property; the income approach estimates value from the income that the property could be expected to generate; and the comparable sales approach estimates value from the prices paid for similar properties." *River's Edge*, 359 Or at 827.

The ultimate decision about which approach to use—or whether to use a combination of approaches—is a question of fact that depends on how the record developed in the case. *See Pacific Power & Light Co. v. Dept. of Rev.*, 286 Or 529, 533, 596 P2d 912 (1979) (so stating); *Brooks Resources Corp. v. Dept. of Revenue*, 286 Or 499, 503-04, 595 P2d 1358 (1979) (same). If more than one approach is used, then the value indications produced by the different approaches must be reconciled. *Powell Street I v. Multnomah County Assessor*, 365 Or 245, 250, 445 P3d 297 (2019); *River's Edge*, 359 Or at 827; *see Medical Building Land Co. v. Dept. of Rev.*, 283 Or 69, 72 n 2, 582 P2d 416 (1978) (discussing concept under prior term "correlation").

C.  *Administrative Rule and WSATA Handbook*

As mentioned above, the legislature has given the department authority to make rules prescribing the "methods and procedures" to be used to determine real market value "in all cases." ORS 308.205(2) (providing that, "in all cases," real market value "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue"). The legislature has also given the department specific authority to make rules that apply to central assessment. ORS 308.655 ("The Department of Revenue may prescribe directions, rules and regulations to be followed in answering any requirement of ORS 308.505 to 308.674.").

The department's valuation rule at issue in this case is OAR 150-308-0690. It provides in its entirety:

> "The 2009 Western States Association of Tax Administrators Appraisal Handbook: Unit Valuation of Centrally Assessed Properties is adopted as the official valuation guide for property assessed by the Oregon Department of Revenue under ORS 308.505 to 308.665 for ad valorem tax purposes."

The handbook that the rule incorporates by reference—Western States Association of Tax Administrators Committee on Centrally Assessed Property, *Appraisal Handbook: Unit Valuation of Centrally Assessed Properties* (2009), generally called the "WSATA Handbook"—is as lengthy as the rule is short. The Tax Court's opinion gave the following summary:

> "The 'WSATA Handbook' consists of approximately 350 pages of guidance, in varying degrees of depth, about methods and tools for unit valuation and value allocation with respect to utility property and other centrally assessed property. It 'serves as the primary textbook *** to train state government appraisers of centrally assessed properties.' WSATA Handbook at vi. As such it 'incorporates WSATA's opinion of the current state of academic and appraisal theory' as applicable to centrally assessed property. *Id.* at I-I. *** [T]he authors of the WSATA Handbook identify strengths and weaknesses in various valuation methods and theories; they rarely mandate or entirely condemn the use of a particular method, but they express reasons to prefer some techniques and to reject others."

*PacifiCorp*, 25 OTR at 230 (first omission in original).

The WSATA Handbook's valuation methods broadly match those discussed above, providing details as to each of the three standard approaches: comparable sales, capitalization of income, and cost. *See* WSATA Handbook at II-1 *et seq.* (cost approach); *id.* at III-1 *et seq.* (income approach); *id.* at V-1 *et seq.* (comparable sales approach).[3] Furthermore, the WSATA Handbook's valuation methods are directed to obtaining a value, the definition of which is substantially equivalent to Oregon's definition of "real market value." *Compare* WSATA Handbook at I-2 (goal is "a value equivalent to a transaction where open market conditions exist, including a willing buyer and a willing seller, both parties knowledgeable as to the likely and permitted uses of the property (both presently and prospectively), no undue pressure or force to buy or sell, reasonable time exposure of the property to the market, and arm's-length negotiations"), *with*

---

[3] The WSATA Handbook also includes an approach called the "stock and debt indicator," which is "a surrogate or substitute for the sales comparison indicator of value." *Id.* at IV-1.

ORS 308.205(1) ("real market value" means "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year").

## II.   FACTS AND HOLDING BELOW

### A.   *Facts and Procedural Posture*

PacifiCorp is an electric utility that operates both inside and outside Oregon. As an electricity business, PacifiCorp is centrally assessed under ORS 308.515(1)(k).

The issue in this case involves PacifiCorp's valuation for tax year 2020-21. At trial before the Tax Court, PacifiCorp presented expert testimony arguing that its overall value was $14.85 billion, with $2.23 billion attributable to Oregon, while the department countered with expert testimony asserting that PacifiCorp's overall value was $22.50 billion, with $3.71 billion attributable to Oregon. As relevant on review, the department contended that PacifiCorp's appraisal deviated from the WSATA Handbook in two respects, one involving the cost approach and the other involving the income approach. Specifically, as to the cost approach, the department argued that PacifiCorp's appraiser had been incorrect in including a deduction for "obsolescence" from the value that PacifiCorp had submitted in certain federal regulatory filings. The WSATA Handbook states that "generally" the value from those filings should not be adjusted for obsolescence, because obsolescence was, "in theory," already included in the figure. WSATA Handbook at II-12; *see* 25 OTR at 252-55 (discussing and quoting relevant provision of WSATA Handbook).

As to PacifiCorp's income approach, the department asserted that the appraiser had been incorrect in using what is called a "no-growth model." *See PacifiCorp*, 25 OTR at 262 (so noting). The WSATA Handbook strongly discourages using a no-growth model, because it requires a number of potentially questionable assumptions; an appraiser who offers a no-growth model "must be able to defend all these assumptions with actual market evidence." WSATA Handbook at III-16. In addition, the WSATA Handbook

noted that the no-growth model leads to values that are "almost always" below actual sale prices. *Id.*

B.  *Tax Court's Ruling*

The Tax Court ultimately issued an 80-page opinion addressing the various arguments presented by the parties. *PacifiCorp*, 25 OTR 227.

The court began by addressing, as a threshold matter, the "level of deference" that the court should accord the WSATA Handbook. 25 OTR at 230; *id.* at 231 (same). It noted that the department had argued that the WSATA Handbook, adopted as an administrative rule, was controlling and so, in the department's view, the Tax Court was required to reject at least some parts of PacifiCorp's appraisal evidence. *See* 25 OTR at 231 (quoting department's arguments, including assertion that there was no need for court to "'engage in debate over the theoretical propriety'" of certain assertions, because "'the administrative rule [incorporating the WSATA Handbook] answers the questions'"). PacifiCorp, by contrast, asserted that the Tax Court's *de novo* review of the proceedings[4] meant that the Tax Court was free to ignore the WSATA Handbook entirely. *Id.*

The Tax Court concluded that the appropriate "level of deference" owed to the handbook would be determined by applying the framework from *Springfield Education Assn. v. School Dist.*, 290 Or 217, 223-30, 621 P2d 547 (1980), to the statutes that authorized the department to enact the rule. *See PacifiCorp*, 25 OTR at 231-34. Although the court examined three statutes, most of its analysis focused on the rulemaking authority in ORS 308.205(2): "Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue[.]" 25 OTR at 237-44.

The Tax Court's opinion does not make it entirely clear how the court thought that *Springfield* might apply to ORS 308.205(2). Despite the text of the statute, the court seemed concerned that perhaps the legislature had

---

[4] ORS 305.425(1) provides that "[a]ll proceedings before the judge or a magistrate of the tax court shall be original, independent proceedings and shall be tried without a jury and de novo."

not intended to give the department any "discretion" at all. *See* 25 OTR at 243 (absent prior case law, court suggested appropriate analysis would turn on whether the statutory phrase "in accordance with" conferred "a 'range of discretion' upon [the department]," and if it did confer discretion, whether department had abused that discretion by adopting WSATA Handbook "to the exclusion of any other method of determining real market value").

The Tax Court explained, however, that it was not "writing on a blank slate," in light of this court's decision in *Portland Canning Co. v. Tax Com.*, 241 Or 109, 404 P2d 236 (1965). *Portland Canning* addressed the extent to which the State Tax Commission could by rule require value to be determined using replacement cost rather than market value. This court said that, "[w]hile the [state tax] commission has been given power to make regulations setting forth procedures as to how this may be done, it cannot vary the mandate of the law under this guise." 241 Or at 113. Relying on *Portland Canning*, the Tax Court concluded that the administrative rules cannot override the statutory or constitutional definitions of "real market value." As the court framed it, the department's rules cannot

> "compel the use of methods and procedures that fail to result in real market value in a particular case. Stated positively, a taxpayer remains free to argue that a value determined in accordance with [the department's] rules is inconsistent with the definition of real market value in subsection (1) of ORS 308.205, and the court is not bound to accept a value determined under [the department's] rules if the court finds that another value, determined under methods or procedures not in accordance with [the department's] rules, is correct."

25 OTR at 244.

In short, the Tax Court concluded that the department's rule adopting the WSATA Handbook did not bind the court in its determination of real market value. The court did not identify any provision of the WSATA Handbook as being inconsistent with the constitutional or statutory definitions of "real market value." To the contrary, the court expressly noted that the WSATA Handbook "rarely mandate[s] or

entirely condemn[s] the use of a particular method." *Id.* at 230. Nevertheless, the court went on to conclude that it need not "defer" to the administrative rule regarding *any* "methods and procedures":

> "The court concludes that it need not defer to OAR 150-308-0690 with respect to methods and procedures of determining the real market value of [PacifiCorp's] system, to the extent that the source of the rule's authority is ORS 308.205(2)."

25 OTR at 244. The court added in a footnote that its holding "does not render the WSATA Handbook, or any other rules, meaningless," because the WSATA Handbook would still bind the department and local assessors. 25 OTR at 244 n 11 ("[the department's] rules under ORS 308.205 bind not only [the department], but also the assessors in all counties").

That broad conclusion was echoed later in the Tax Court's opinion regarding the specific appraisal evidence offered by the parties. Regarding the cost approach and PacifiCorp's deduction for obsolescence, the Tax Court relied on its conclusions regarding deference to hold that it was not required to follow the WSATA Handbook "as a matter of law," provided that a taxpayer "can persuade the court that a value determined pursuant to the WSATA Handbook is not the real market value of the property." 25 OTR at 255. Ultimately, however, the Tax Court was not persuaded to accept PacifiCorp's proposed deduction for obsolescence as part of the cost approach—and in the end, declined to give weight to the cost approach entirely. *See id.* at 257 ("The court finds that the preponderance of the evidence does not support [PacifiCorp's] proffered economic obsolescence adjustment to net book value."); *id.* at 259 ("[T]he court finds no factual basis to assign any weight to either party's cost indicator of value." (Footnote omitted.)).

The Tax Court's conclusion that it was not bound by the WSATA Handbook appears to have been more significant in the case of the income approach. The court noted that the WSATA Handbook was critical of no-growth models. *Id.* at 262. It then reviewed evidence that supported PacifiCorp's no-growth position, as well as the department's

contrary appraisal evidence. *Id.* at 262-68. The Tax Court characterized both parties' approaches as "imperfect measures," and it critiqued PacifiCorp's essentially "theoretical" approach that it could never have growth because it was a regulated utility. *Id.* at 269. In the end, however, the court agreed to accept PacifiCorp's no-growth model. *Id.*

In light of those determinations, as well as many others, the Tax Court ultimately determined that PacifiCorp's overall value was $17.24 billion, with $2.84 billion attributable to Oregon. *See id.* at 307 (summarizing conclusion).

## III.   ANALYSIS

### A.   *Issue and Standard of Review*

On appeal, the department presents a narrow legal issue: whether the Tax Court erred in concluding that it was not bound by the WSATA Handbook as incorporated by administrative rule. As the department summarized it in its reply brief: "[T]his cross-appeal reduces to a simple claim: Lawfully promulgated administrative rules have the force of law. Courts must apply them as they would apply statutes or constitutional provisions." Because the issue before us is fundamentally one of law, we review the Tax Court's conclusions for errors of law. ORS 305.445.

### B.   *Department's Authority to Enact Rule*

Under the *Planned Parenthood* sequence of analysis, we begin by considering whether the department had statutory authority to adopt the WSATA Handbook as an administrative rule. *See* 297 Or at 565 ("whether the action fell within the reach of [the agency's] authority"); ORS 183.400(4)(b) (rule is invalid if it "[e]xceeds the statutory authority of the agency").[5]

We do not understand PacifiCorp to contend that the department lacked statutory authority to promulgate the rule or to adopt the handbook. Moreover, the department's authority to do so is readily established by the plain

---

[5] ORS 183.400 is a provision of the Administrative Procedures Act (APA). Although the legislature has exempted the department from some provisions of the APA, it did not exempt the department from ORS 183.400. *See* ORS 183.315(1) (listing those provisions of APA that do not apply to Department of Revenue).

text of ORS 308.205(2). Again, the relevant text provides that "[r]eal market value *in all cases* shall be *determined by methods and procedures in accordance with rules adopted by the Department of Revenue*[.]" (Emphases added.) It is not disputed here that the WSATA Handbook sets out "methods and procedures," and that those methods and are directed toward determining the substantive equivalent of "real market value" as defined in Oregon.

We further note that the legislature has given the department rulemaking authority in the specific context of central assessment. ORS 308.655 provides:

> "The Department of Revenue may prescribe directions, rules and regulations to be followed in answering any requirement of ORS 308.505 to 308.674 [the central assessment statutes]."

One requirement of the central assessment statutes is to determine the real market value of the real, personal, and intangible property of centrally assessed businesses.

We need not decide whether ORS 308.655, if it stood alone, would be sufficient to authorize the department to prescribe the methods and procedures to determine the real market value of centrally assessed businesses, because it does not stand alone. ORS 308.205(2) gives the department that authority for "all cases" involving real market value, and nothing in ORS 308.655 limits that authority as it applies to central assessment.

The Tax Court appears to have reasoned that the department's statutory authority to adopt the handbook may be limited to proceedings before the department and cannot "bind" a court. To the extent that the Tax Court adopted that view for *textual* reasons, that conclusion is not consistent with ORS 308.205. Textually, nothing limits the department's rulemaking authority to proceedings before the department alone. The Tax Court is determining "real market value," and statutory text provides that real market value "shall be determined" "in accordance with" the department's rules regarding methods and procedures.

Moreover, the statute as a whole sets out legal standards that apply to the courts as well as the department.

The definition of "real market value" in ORS 308.205(1) certainly applies to the courts. But that thread continues into ORS 308.205(2), which provides:

> "Real market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue and in accordance with the following:

> "(a)   The amount a typical seller would accept or the amount a typical buyer would offer that could reasonably be expected by a seller of property.

> "(b)   An amount in cash shall be considered the equivalent of a financing method that is typical for a property.

> "(c)   If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property.

> "(d)   If the property is subject to governmental restriction as to use on the assessment date under applicable law or regulation, real market value shall not be based upon sales that reflect for the property a value that the property would have if the use of the property were not subject to the restriction unless adjustments in value are made reflecting the effect of the restrictions."

Setting aside for the moment the reach of the department's rulemaking authority, there seems little doubt that every other paragraph of subsection (2) would apply to the courts. "Real market value" must accord with the amount that a typical seller would accept or a typical buyer would offer (subsection (2)(a)); amounts in cash must be considered the equivalent of typical financing methods (subsection (2)(b)); if there is no immediate market value, then just compensation may be used (subsection (2)(c)); and, when valuing a property subject to a governmental restriction, market values for properties not subject to that restriction either cannot be used, or must be adjusted to account for the difference (subsection (2)(d)).

In other words, every other part of ORS 308.205 addressing "real market value" applies to the courts. We see no textual reason to conclude that the one exception to that application is a rule, promulgated pursuant to ORS 308.205,

prescribing the "methods and procedures" to be used to determine "real market value."

PacifiCorp contends that ORS 305.412 supports the Tax Court's conclusion that the WSATA Handbook, as an administrative rule, is not legally binding on appeal to the courts. ORS 305.412 provides:

> "When the determination of real market value *** is an issue before the tax court, the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties."

The Tax Court did not rely on that provision, nor are we persuaded by PacifiCorp's argument. On its face, ORS 305.412 simply makes it clear that the Tax Court is not bound by the "values pleaded by the parties." It sheds no light on whether the Tax Court is bound by validly promulgated administrative rules.[6]

In sum, under the first step of the *Planned Parenthood* analysis, the department had authority to adopt

---

[6] PacifiCorp cites decisions from other jurisdictions in support of its position, but they are distinguishable.

In *Morgan Cnty. Bd. of Equalization v. Indorama Ventures Xylenes & PTA, LLC*, 400 So 3d 596, 602 (Ala 2024), the Alabama Supreme Court upheld a circuit court's refusal to follow a valuation manual issued by the county board of equalization. But it did so because the manual was just an administrative handbook; the provisions of that manual "are not rules, regulations, or general orders of [an] administrative authority that have the force of law." *Id.* (alteration in original; internal quotation marks and citations omitted).

The decision in *PacifiCorp, Inc., et al. v. Utah State Tax Comm'n*, Case No. 180903986 (Ut 2d Jud Dist Ct, Tax Div, Jan. 23, 2020) (available online at https://www.utcourts.gov/content/dam/courts/dist/tax/PacifiCorp_et_al_v_USTC-Decision_and_Order-180903986.pdf, accessed Sept 11, 2025), appears similar. The trial court declined to follow an administrative rule, Utah Admin Code R884-24P-62, but that was because it provided "internal guidance" for the tax commission regarding how to value centrally assessed businesses. *Id.* at 4 (internal quotation marks and citation omitted); *see* Utah Admin Code R884-24P-62(1) (a) (purpose of rule is to "specify consistent *** methodologies to be used by the [Utah Tax Commission's] Property Tax Division").

PacifiCorp also references the United States Supreme Court's decisions in *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 US 837, 104 S Ct 2778, 81 L Ed 2d 694 (1984), and its overruling in *Loper Bright Enterprises v. Raimondo*, 603 US 369, 144 S Ct 2244, 219 L Ed 2d 832 (2024). They are beside the point. So-called "*Chevron* deference" "is foreign to the administrative law of this state." *Friends of Columbia Gorge v. Columbia River (S055722)*, 346 Or 366, 378, 213 P3d 1164 (2009) (footnote omitted).

the WSATA Handbook prescribing the "methods and proce-
dures" to be used to determine "real market value."

The second step under *Planned Parenthood* would
ordinarily be to consider whether the department had com-
plied with rulemaking procedures in adopting the WSATA
Handbook. 297 Or at 565; *see* ORS 183.400(4)(c) (same). That
step is unnecessary here, as the Tax Court did not call into
question the department's compliance with rulemaking pro-
cedures, nor does PacifiCorp on appeal.

C.  *Validity of Rule*

We now turn to the third step in *Planned Parenthood*
and consider whether the WSATA Handbook, as an admin-
istrative rule, is invalid because it "contravened some other
applicable statute [or constitutional provision]." 297 Or at
565; *see* ORS 183.400(4)(a), (b) (agency rule will be invalid if
it "[v]iolates constitutional provisions" or "[e]xceeds the stat-
utory authority of the agency"). In this case, constitutional
and statutory boundaries constrain what the department
may do through its valuation "methods and procedures": the
methods and procedures must lead to results consistent with
the constitutional and statutory definitions of "real market
value." *See* Or Const, Art XI, § 11(11)(a)(A); ORS 308.205(1);
ORS 308.205(2)(a) - (d).

Beginning with the question of facial validity: We
see no basis here for declaring the rule invalid on its face,
nor do we understand the Tax Court to have reasoned other-
wise. There is no argument that the WSATA Handbook is
directed toward a substantive goal inconsistent with "real
market value" as Oregon defines it. Nor is there any conten-
tion that the WSATA Handbook prescribes something other
than "methods or procedures" for determining that value.

Thus, if there is to be a reason for not applying the
WSATA Handbook in this case, it must be that the depart-
ment's rule is invalid "as applied." The focus of that analysis
is whether following any prescribed "methods and proce-
dures" of the WSATA Handbook would—on the facts and
evidence before the court—have led to a result inconsistent
with real market value as Oregon defines it.

As a practical matter, we observe that the nature of the WSATA Handbook means that it would rarely meet the criteria to be invalid as applied. That is so because the WSATA Handbook itself generally recognizes that particular facts may require different methods and procedures. Again, as the Tax Court recognized, the WSATA Handbook generally only "identif[ies] strengths and weaknesses in various valuation methods and theories"; it "rarely mandate[s] or entirely condemn[s] the use of a particular method," instead "express[ing] reasons to prefer some techniques and to reject others." *PacifiCorp*, 25 OTR at 230. For the WSATA Handbook to be invalid as applied, it presumably would have to compel the use of some method or procedure *despite* particular facts that caused that method or procedure to generate a result inconsistent with Oregon's definition of real market value. Or, to put it the other way around: If the WSATA Handbook does not go so far as to compel a method or procedure despite particular facts, then it is difficult to see how it would be invalid as applied, because it would not require a result inconsistent with Oregon real market value.

As an example, consider one matter addressed in the Tax Court: PacifiCorp's deduction of obsolescence from the value shown in the regulatory filing as part of its cost approach. *See* 25 OTR at 253-55. The WSATA Handbook does not prohibit deducting obsolescence. It only strongly recommends against it, and it explains why: The WSATA Handbook expects the value shown in the regulatory filing to already have deducted obsolescence, and so deducting it a second time would be double-counting. WSATA Handbook at II-12 ("The practice of not adjusting * * * for perceived obsolescence does not mean that obsolescence has not been considered and measured, since as noted previously, regulatory depreciation should, in theory, reflect all forms of obsolescence."); *see* 25 OTR at 255 n 20 (quoting that provision). If that assumption was *not* true in a particular case—if the value shown in the filing did *not* already have obsolescence deducted—then the handbook's rationale would no longer apply.

The Tax Court does not appear to have considered whether the WSATA Handbook was invalid as applied to

the facts of PacifiCorp's case. Rather, the court's threshold conclusion that the WSATA Handbook was not entitled to "deference"—that it does not bind a court *at all*—meant that the court, as we understand its opinion, did not consider whether particular provisions of the WSATA Handbook, when applied to the evidence here, might be inconsistent with the constitutional and statutory limits on "real market value."

The Tax Court's focus on whether the court owed "deference" to the rule, and on whether the rule had binding effect beyond proceedings within the department itself, seems to have originated from its emphasis on the framework from *Springfield*. But that framework is inapposite.

*Springfield* set out the analytical framework used to determine the "[a]llocation between agencies and courts of responsibility *for giving specific meaning to statutory terms.*" 290 Or at 221 (emphasis added). The *Springfield* framework identified "three classes of statutory terms," distinguished by where the legislature intended to place the "responsibility" to interpret those terms. *Id.* at 223. "Exact terms," or "terms of precise meaning," are terms such as "21 years of age"; they require only agency factfinding, and interpretation rests with the courts. *Id.* "Inexact terms" are those that "embody[] complete expressions of legislative meaning, even though that meaning may not always be obvious." *Id.* at 224. With such terms, the legislature has "made a complete policy statement," and again, "the court ultimately discerns and applies that meaning as a matter of law." *Id.* at 225. By contrast, "delegative terms"—statutory terms such as "good cause"—are terms that "express non-completed legislation which the agency is given delegated authority to complete." *Id.* at 228. In that case,

> "[t]he delegation of responsibility for policy refinement under such a statute is to the agency, not to the court. The discretionary function of the agency is to make the choice[,] and the review function of the court is to see that the agency's decision is within the range of discretion allowed by the more general policy of the statute."

*Id.* at 229.

*Springfield* does not materially aid the analysis here, because, as we have explained, there is no genuine issue concerning the authority that the legislature gave the department. ORS 308.205(2) expressly authorizes the department to promulgate "methods and procedures" that are to be used to determine "real market value." It is undisputed that the WSATA Handbook's provisions qualify as "methods and procedures," and it is undisputed that those methods and procedures are directed toward the goal of identifying substantially the "real market value" as that term is defined in Oregon.

The Tax Court, in its reliance on *Portland Canning*, also appears to have reasoned that the department's statutory rulemaking authority cannot extend so far as to preclude a court from using whatever method it determines best for determining real market value. *Portland Canning* does not reach so broadly. In that case, the then-version of ORS 308.205 permitted the use of replacement cost *only* for "'property which has *no immediate market value*.'" 241 Or at 112 (emphasis added; quoting ORS 308.205 (1963)). Pursuant to a rule, the State Tax Commission in that case had valued taxpayer's property using replacement cost. *Id.* at 111. The record established, however, that there was in fact a market for the underlying property, making the "immediate market value" readily ascertainable. *Id.* at 113-14. On that record, this court held that the Tax Commission had erred, because the commission's rule could not override the statutory directive to seek the *actual* market value:

> "Clearly the dominant note of the legislation is that, if possible, value is to be ascertained in accordance with market value. While the commission has been given power to make regulations setting forth procedures as to how this may be done, it cannot vary the mandate of the law under this guise. If a market existed for the kind of property being assessed, the property had to be evaluated by the market data approach. The commission has no power to permit the evaluation of the property by the exclusive means of the cost approach to determine the value to the owner when a market in fact exists."

*Id.* at 113.

*Portland Canning* thus held that the department's rule must give way if it conflicts with the constitutional and statutory definition of "real market value." That invalidity depends on there being a true conflict, as existed on the unique facts of that case, where there actually was an "immediate" market for the underlying property, making the determination of real market value ascertainable without resort to the methods and practices that are intended for use when no such market exists. Although it did not use these words, *Portland Canning* can thus be understood to have concluded that the commission's rule was invalid as applied. Absent such a conflict, *Portland Canning* does not stand for the proposition that a court is not as bound by a valid administrative rule as it is by other law. Nor does it support the proposition that, where methods and practices must be used to make a determination of real market value (because an "immediate market" for the property does not exist, as in *Portland Canning*), a court may use methods or practices contrary to the methods and practices validly adopted by the department, to which the legislature has entrusted the task.[7]

Given the Tax Court's legal error regarding the validity of the WSATA Handbook, we conclude that its decision should be reversed and remanded. If the Tax Court had applied the correct legal standard that we have described, it might have reached a different result on one or more factual issues in this case. As we have explained, the WSATA Handbook generally allows for some flexibility, which means that the Tax Court might have arrived at the same factual determinations that it reached even if it had treated the Handbook as binding. However, we cannot say with certainty, on this record, that the Tax Court would have done so. Accordingly, because the court used the wrong legal standard, we reverse its decision, and we remand for the

---

[7] The Tax Court also cited this court's decision in *Alsea Veneer, Inc. v. Dept. of Rev.*, 297 Or 512, 687 P2d 137 (1984). *See* 25 OTR at 241-42. Although the *Alsea* court discussed both the applicable version of ORS 308.205 and the department's relevant rule, 297 Or at 516-17, the facts make it distinguishable. In rejecting the department's contention that the Tax Court was required to follow the rule but had failed to do so, this court explained that the Tax Court had acted consistently with the rule. *See id.* at 517 ("What was anticipated by the rule is precisely what occurred here.").

court to apply the correct legal standard to the evidentiary questions.

We emphasize the limited nature of this holding. Our decision does not preclude a taxpayer from arguing that application of the handbook (or any other statute or rule) would lead to a result that is at odds with the Oregon Constitution. Nor is the Tax Court compelled to adopt a valuation resulting from application of a departmental rule if that valuation would be inconsistent with the constitutional and statutory definitions of real market value. If the Tax Court had treated the WSATA Handbook as a relevant source of law and found that it required a finding of real market value at odds with how the constitution or statutes define "real market value," that would, in essence, be a ruling that the rule was invalid as applied.

As we read the record, that is not what occurred here. PacifiCorp argued that, in this *de novo* proceeding, the Tax Court did not need to even consider the handbook because its legal effect was limited to proceedings internal to the department. It appears that the Tax Court agreed, couching its reasoning in terms of whether the rule was "binding" or entitled to "deference." In other words, we do not understand the Tax Court to have *applied* the rule and determined that such application would produce a problematic outcome; instead, it seems to have concluded that the department's rule had no role to play in the court's analysis. We hold only that the court erred by failing to treat the department's rule as a relevant source of law that controls unless, if applied in fact, it would compel a result contrary to the constitution or statute.

The judgment of the Tax Court is reversed, and the case is remanded to the Tax Court for further proceedings.